

* 1 0 6 0 6 2 7 5 3 5 *

FILED IN THE DISTRICT COURT
ROGERS COUNTY OKLAHOMA

DEC 11 2024

CATHI EDWARDS, COURT CLERK

DEPUTY

## IN THE DISTRICT COURT IN AND FOR ROGERS COUNTY
## STATE OF OKLAHOMA

| | |
|---|---|
| 1.  BRIDGETT JAMISON, an individual, | **JURY TRIAL DEMANDED** |
| Plaintiff, | **ATTORNEY LIEN CLAIMED** |
| v. | |
| 1.  GRAND LAKE MENTAL HEALTH CENTER, INC. D/B/A GRAND MENTAL HEALTH; | Case No. CJ 2024-530 |
| Defendant. | |

## PETITION

COMES NOW the Plaintiff, BRIDGETT JAMISON, by and through her attorney, Kymberli J. M. Heckenkemper of HAVEN LAW GROUP, PLLC, and brings this action for damages against Defendant GRAND LAKE MENTAL HEALTH CENTER, INC. D/B/A GRAND MENTAL HEALTH for violations of Title VII of the Civil Rights Act of 1964. In support of her Petition, Plaintiff alleges and states as follows.

### PARTIES, JURISDICTION & VENUE

1.  Plaintiff BRIDGETT JAMISON is an individual who resides in Osage County, State of Oklahoma.

2.  Defendant GRAND LAKE MENTAL HEALTH CENTER, INC. D/B/A GRAND MENTAL HEALTH (hereinafter, "GRAND") is a domestic not-for-profit corporation organized under the laws of the State of Oklahoma. Its principal place of business is located in Nowata County, State of Oklahoma.

3.  This cause of action arose in Rogers County, State of Oklahoma.

4.  Venue is proper in this Court pursuant to 12 O.S. § 134.

1

**EXHIBIT**

2

5.    The Court has jurisdiction over this matter.

6.    Plaintiff timely filed a charge with the EEOC and the Oklahoma Attorney General's Office alleging race, color and age discrimination in employment on December 24, 2023.

7.    A Notice of Right to Sue was issued on September 12, 2024.

## STATEMENT OF FACTS

8.    Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

9.    Plaintiff is a member of a protected class with respect to color and race, as she is a Black, African-American woman.

10.    At all relevant times, Plaintiff held master's degrees in social work as well as administration, so she was well-versed in leadership techniques. This was a unique credential that most if not all of her white counterparts did not share.

11.    At all relevant times, Plaintiff was a social worker and employed by GRAND. Plaintiff started her employment at GRAND on March 7, 2022 and was constructively discharged in August 2023.

12.    Plaintiff was hired by Chancey Bosh, the now-former Executive Director, who specifically intended to hire more minorities to increase diversity amongst the staff in Rogers County, which operation was previously managed by all white people and employed an overwhelmingly white staff.

13.    In her first three or four months at GRAND, Plaintiff underwent training, so she did not begin seeing clients until June or July of 2022.

14.    In August or September of 2022, Chancey was promoted, and Laura Dyer Smith— a white female—was installed as the new Executive Director, and Plaintiff's supervisor.

15.     Plaintiff's position at all relevant times was Integrative Team Manager, meaning she served in roles as both a therapist and a supervisor over a Behavioral Health Coach (Rachel) and a Care Coordinator/Case Manager (Ashley), and a Family Support Worker (Lori)—all white females.

16.     All of her supervisors were white as well.

17.     Regularly, Plaintiff would sit down with her team members individually, and as part of those meetings, she would ask for feedback about her leadership, and she never received any negative feedback.

18.     Plaintiff was told at the beginning of her employment that if her team members did not complete their timesheets on time, Plaintiff would be written up.

19.     In September 2022, Plaintiff started to notice that her team was not completing their documentation and that things were missing from clients' charts, so she had to start being more active in her role as a manager by reminding her subordinates to complete their work and timesheets and providing them deadlines to ensure her own deadlines were met.

20.     Plaintiff's team members started pushing back on Plaintiff's requests that they complete their timesheets and work assigned to them, engaging in insubordination and telling Plaintiff things like, "I know how to do my job," "don't tell me what to do," etc.

21.     This is when Plaintiff started experiencing discrimination.

22.     From September 2022 to August 2023, Plaintiff was subjected to disparate treatment and a hostile work environment on account of her race.

23.     Plaintiff was given sooner deadlines than her white counterparts, with no explanation as to the reason.

3

24. As a supervisor, Plaintiff was put in charge of subordinates who had previously had similar problems with or otherwise could not work with their former Black supervisors—such as failing to follow directives from them and doing underhanded things behind those Black supervisors' backs.

25. Because of those problems, these subordinates were simply removed from their former Black supervisors' teams and placed on Plaintiff's team.

26. Ashley—a subordinate—would scream and cry to Plaintiff's supervisors about how she did not want her supervisors telling her what to do.

27. Plaintiff was required to undergo "coaching" about her leadership style (a part of GRAND's progressive discipline that can eventually lead to termination) simply for asking her subordinates to submit their time and complete their required documentation in a timely manner and calling to remind them to do so on their days off in an effort to ensure they were compensated.

28. Co-workers, including superiors, described Plaintiff as "intense," and "dominant," and suggested she needed to be "more human," propagating the stereotype of the "angry Black woman," simply because Plaintiff was doing her job of trying to hold her subordinates accountable for their work.

29. One superior, Ms. Dyer Smith, who yelled at Plaintiff in a meeting about her treatment of Ashley, asked why Plaintiff was not "coming back at her," as if she *expected* Plaintiff to act like more of an "angry Black woman."

30. Plaintiff went to HR to complain about the racist treatment the very next day.

31. Likely because Ms. Dyer Smith was about to be promoted to Regional Manager at the time that this occurred, the HR employee responded by simply removing the insubordinate Ashley from Plaintiff's team rather than doing anything about the racist treatment to which Ms.

4

Dyer Smith had subjected Plaintiff. Ashley was replaced with another Care Coordinator/Case Manager named Lauren—another white female.

32.    Additionally, in response to Plaintiff's complaint, the HR employee called Plaintiff with Ms. Dyer Smith also on the line, and the HR employee and Ms. Dyer Smith decided to require *Plaintiff* to undergo "leadership training," which, although HR told her it was not discipline, turned out to be part of progressive discipline that can lead to termination.

33.    After this, Ms. Dyer Smith started either essentially giving Plaintiff the silent treatment, or else treating Plaintiff nicely but in a sarcastic or ironic way. She did not treat others with this sort of disrespect.

34.    Another Black female employee, who quit her position at GRAND just two weeks before Plaintiff was constructively discharged, also had similar problems with Ms. Dyer Smith.

35.    Meanwhile, Matt Spencer, who at the time was Plaintiff's Clinical Director and now serves as Chief Clinical Officer, came to a meeting and spoke to Plaintiff's subordinates, telling them they needed to do what Plaintiff was asking and telling them to do.

36.    When Ms. Dyer Smith was promoted to Regional Manager, she began to have even more authority over Plaintiff—authority which she abused.

37.    Ms. Dyer Smith told Plaintiff that her "wellness days" (alternating Fridays that she and her team members had been allowed to take off) would be taken away if she "didn't get her numbers up."

38.    Plaintiff had never been taught how to track her numbers, but as soon as she asked for support on how to do that from her learning coach—Chancey Bosh—her numbers were among the top five-to-ten teams in the company, which has approximately seventy-five teams.

39.    This was the case in spite of the fact that two of Plaintiff's team members—who had essentially been given carte blanche to do whatever they wished after Plaintiff was not supported by her superiors in seeking to hold them accountable—began undermining her, such as telling clients that they didn't need to have Plaintiff as a therapist anymore without her authority.

40.    When Ms. Dyer Smith was promoted, Amber McDonald (another white female) was installed as the new Executive Director in or around January 2022.

41.    Because of this transition, Plaintiff's team was being subjected to new scrutiny. Because of this and the fact that Plaintiff had already been retaliated against for her complaint of racism to HR, Plaintiff continued holding her team members accountable for getting their work done and turning in their timesheets in a timely manner to ensure her team was viewed as performing at a high level.

42.    Nevertheless, and despite that Plaintiff's numbers were among the best in the company, Plaintiff started being called into meetings about her productivity by Ms. McDonald.

43.    From the outset, Ms. McDonald treated Plaintiff similarly to how Ms. Dyer Smith had treated Plaintiff, showing a clear bias influenced by the latter.

44.    These meetings were with Ms. McDonald and Plaintiff's peer supervisor (a peer dedicated to providing support and supervision over social workers who have not yet been fully licensed), Oteasa Gist.

45.    Plaintiff had spoken with Gist on numerous occasions about the problems she had been having with the retaliation and lack of support from her supervisors.

46.    Additionally, Plaintiff—who had been part of a pilot program as part of a "Learning Coach Team," which Chancey Bosh initially chose her for and led—often spoke with Mr. Bosh

about the issues she had been facing, and Mr. Bosh assured Plaintiff that she had been doing everything she was supposed to do.

47.    Plaintiff also had a Licensing Supervisor from the state board—Sherilynn Wallace—with whom Plaintiff met weekly.

48.    During these meetings, Plaintiff told Ms. Wallace about the issues she was having with both her team and supervisors and the difficulties they were causing.

49.    In February, GRAND hired Ms. Shermaine Woodward—a Black female—to be the Clinical Director (after Mr. Spencer was promoted).

50.    In February, Mr. Bosh advised Plaintiff that she "had a target on her back" and that Ms. Dyer Smith and Ms. McDonald were requiring him to call Plaintiff into a meeting to reprimand her about her productivity. Mr. Bosh refused because Plaintiff was part of a protected class and Ms. Dyer Smith and Ms. McDonald had not had similar conversations with leaders of teams whose productivity was not as high as Plaintiff's.

51.    Even though Plaintiff's productivity was among the highest in the company, Ms. Dyer Smith and Ms. McDonald had decided that Plaintiff was not working quickly enough.

52.    In January 2022, Ms. McDonald advised Plaintiff that her team needed to be at 90% by the 10th of each month—a benchmark Ms. McDonald arbitrarily imposed on Plaintiff that was not required of Plaintiff's white counterparts.

53.    Plaintiff went on vacation in March 2022, and when she came back, she had an email in her inbox from Ms. McDonald asking Plaintiff to meet with her.

54.    When Plaintiff walked into the meeting, she encountered Ms. McDonald and HR director.

55.    At the meeting, Ms. McDonald told Plaintiff, "Bridgett, we can't keep moving people off your team." She also advised that Plaintiff's team members kept accusing her of calling them "after hours" (they were salaried employees), and that they kept voicing their desires to be placed on another ITM's team. During the course of the meeting, Ms. McDonald brought up the leadership training that Plaintiff had been required to attend in retaliation for her complaint to HR as part of the justification for requiring Plaintiff to draw up a synopsis of her plan for how she was going to make her team better. They argued that because they had only given her the leadership training before, that they had already given her a chance to fix the problem.

56.    Plaintiff did not understand what the problem was, so she went to speak to her subordinates to ask them what their concerns were.

57.    Rachel advised Plaintiff that there was "a lot" wrong because, when Plaintiff walks into a room, she is "just dominant"—again, furthering the "angry Black woman" stereotype.

58.    Lauren advised that she did not like that she felt she was being rushed to do her work.

59.    At the time, Lauren had sixty days of documentation past due.

60.    About a week later, Plaintiff received a write-up—called a "coaching"—that advised it was part of progressive discipline that could lead to termination.

61.    The write-up was not clear as to what the discipline was intended to address.

62.    Later, Plaintiff was pulled out of a session with a client in the middle of the session by Ms. McDonald, who falsely accused her of a HIPAA violation and demanded that she meet with her the next morning at 8:00 A.M.

63.    After this, Plaintiff sought the policies from HR regarding filing a formal grievance, but she was advised that there was no such policy.

8

64.    As a result, in or about April 2022, Plaintiff wrote a grievance letter about the racist treatment to which she had been subjected and the difficulties she had been facing as a result.

65.    In response, in May 2023, GRAND offered her the opportunity to relocate to the Tulsa location—which would have required Plaintiff to take a $8,000 pay cut.

66.    Additionally, Plaintiff was removed from the Learning Coach Team as soon as Ms. Dyer Smith and Ms. McDonald took over the responsibility of determining who would be on the Learning Coach Team from Mr. Bosh.

67.    Although the pilot program had ended and they were allowing others the opportunity to apply to participate on the Learning Coach Team, Plaintiff knew applying would be futile, given the treatment she had been receiving from the two women in charge of the program and the grievance she had filed against them.

68.    Had Plaintiff been allowed to remain in the Learning Coach Team role, she would have been paid an additional $8,000.

69.    Plaintiff declined to relocate to Tulsa, but nothing else was done with her grievance.

70.    After the grievance was filed, Ms. McDonald would not talk to Plaintiff and instead required her to communicate with her through Ms. Woodward—a Black female.

71.    For the remainder of her employment at GRAND, Plaintiff lived in constant fear of being fired for simply doing her job.

72.    Additionally, GRAND had made it virtually impossible to do her job. She could not hold her subordinates accountable, and she had no support (or even direct communication) from her supervisors. Her supervisors were constantly moving the goal posts on her productivity, and she was constantly being chastised for simply performing her role a manager.

73.     As a result, in August 2023, Plaintiff was constructively discharged from her position at GRAND.

74.     Because of all the racism, discrimination, retaliation, and hostile treatment Plaintiff received, her mental health deteriorated significantly.

75.     Plaintiff took a job that paid $11,200.00 less than she made at GRAND, and she also lost out on approximately $3,000 in annual bonuses.

76.     Had she still been working at GRAND when she finally became fully licensed, she would have received a $10,000 raise.

77.     Accordingly, Plaintiff has suffered significant emotional distress and economic damages.

78.     Plaintiff has also incurred expenses for mental health treatment as a result of her experience at GRAND.

## CLAIM #1:  HOSTILE WORK ENVIRONMENT
### Title VII of the Civil Rights Act of 1964

79.     Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

80.     Plaintiff is a member of a protected class under Title VII on the basis of her race and color.

81.     As a result of Plaintiff's race, she was constantly viewed and treated as an "angry Black woman"—a common stereotype that plagues specifically Black, African-American women.

82.     She was frequently treated differently than her white counterparts and was subjected to hostility and impossible, moving benchmarks.

83.     She was given the silent treatment by superiors and treated with sarcastic niceties, to which her white counterparts were not subjected.

10

84.     Additionally, Plaintiff was required to filter her communications to her white female supervisor through another Black woman.

85.     Based on the frequency and severity of GRAND's agents' conduct, any reasonable person in Plaintiff's position would also have found the work environment to be objectively hostile.

86.     Additionally, GRAND, knowing of the racist treatment and hostility, failed to exercise any reasonable care to promptly prevent and correct the harassment, for example, by:

a.   Failing to discipline employees for their racially disparate and hostile treatment of Plaintiff;

b.   Placing people on Plaintiff's team who had already had similar problems with other Black supervisors;

c.   Failing to take seriously multiple complaints of racially disparate and hostile treatment; and

d.   Taking any other reasonable steps to protect Plaintiff from further racially hostile harassment.

87.     As a direct and proximate result of Defendant's agents' actions and omissions described herein, Plaintiff suffered damages including but not limited to emotional distress and economic damages.

## CLAIM #2: RETALIATION
### *Title VII of the Civil Rights Act of 1964*

88.     Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

89.     Plaintiff engaged in activity protected under Title VII by complaining of the racially hostile and disparate treatment on multiple occasions.

11

90.     As a direct and proximate result of Plaintiff's complaints, she was subjected to multiple materially adverse actions.

91.     Specifically, as one example, Plaintiff was forced to meet discriminatory and arbitrary benchmarks despite her superior productivity.

92.     As another example, Plaintiff was removed from her Learning Coach Team.

93.     As yet another example, Plaintiff was forced to communicate with her white female supervisor through another Black female employee.

94.     Plaintiff was also written up for some unarticulated cause.

95.     Additionally, Plaintiff was eventually constructively discharged.

96.     As a direct and proximate result of Defendant's agents' actions and omissions described herein, Plaintiff suffered damages including but not limited to emotional distress and economic damages.

### CLAIM #3:  CONSTRUCTIVE DISCHARGE
*Title VII of the Civil Rights Act of 1964*

97.     Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

98.     Plaintiff's resignation from her employment with GRAND was a direct result of the racially hostile and disparate treatment she received and GRAND's repeated failure to correct it.

99.     As a result of these actions and inactions by GRAND, Plaintiff's work environment became unbearable.

100.    Based on the treatment Plaintiff received, it can reasonably be inferred that GRAND was attempting to force her to resign by intentionally and knowingly creating and fostering a work environment that made it impossible for Plaintiff to continue working.

12

101.    Plaintiff's resignation was a foreseeable consequence of GRAND's actions and failures to act in the face of the racially hostile and disparate treatment of Plaintiff.

102.    As a direct and proximate result of Defendant's agents' actions and omissions described herein, Plaintiff suffered damages including but not limited to emotional distress and economic damages.

## CLAIM #4:  DISPARATE TREATMENT
### Title VII of the Civil Rights Act of 1964

103.    Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

104.    At all relevant times, Plaintiff met and often exceeded the benchmarks set for her by GRAND.

105.    Still, she was forced to abide by metrics that were not required of her similarly situated white counterparts—even those whose numbers did not measure up to hers.

106.    Additionally, unlike other white ITMs in a similar position, Plaintiff was frequently chastised for simply holding her subordinates accountable for their work, being tagged with labels such as "intense," "dominant," and "inhuman"—all tropes associated with the "angry Black woman" stereotype.

107.    These labels were not given to white ITMs who required the same of their subordinates.

108.    Plaintiff was required to undergo additional training for this, which her similarly situated white counterparts did not have to undergo.

109.    Plaintiff was also eventually disciplined for it, unlike her similarly situated white counterparts.

13

110.    The facts set forth above lead to a reasonable inference that GRAND's motive in treating Plaintiff differently than her similarly situated white counterparts was racially discriminatory.

111.    As a direct and proximate result of Defendant's agents' actions and omissions described herein, Plaintiff suffered damages including but not limited to emotional distress and economic damages.

## PRAYER FOR RELIEF

Plaintiff prays that this Honorable Court will enter judgment in her favor and against the Defendants and award her the following:

1.    All damages suffered by Plaintiff, including, but not limited to, those emanating from lost wages, back pay, front pay, emotional distress, and medical expenses both heretofore incurred and to be incurred in the future, in excess of $75,000.00;

2.    Punitive damages to the extent permitted by law;

3.    Reasonable attorney's fees, expert fees, and costs pursuant to 42 U.S.C. 2000e-5(k); and

4.    Any and all further relief this Court deems just and equitable under the circumstances.

WHEREFORE, premises considered, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and award her the relief prayed for herein.

Respectfully submitted,

Kymberli J. M. Heckenkemper, OBA No. 33524
**HAVEN LAW GROUP, PLLC**
1874 S. Boulder Ave.
Tulsa, Oklahoma 74119
(918) 796-5738 (Office)
(918) 796-5724 (Facsimile)
kym@havenlg.com

*Attorney for Plaintiff Bridgett Jamison*

15